IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS SLOANE, individually and on
behalf of persons similarly situated,

                    Plaintiff,

          vs.                              Civil Action
                                           No. 15-1208

GULF INTERSTATE FIELD SERVICES, INC.,

                    Defendant.
_____

        Transcript of HEARING AND ORAL ARGUMENT proceedings
recorded on Thursday, May 26, 2016, in the United States
District Court, Pittsburgh, Pennsylvania, before
The Hon. Nora Barry Fischer, United States District Judge

APPEARANCES:

For the Plaintiff:        Shanon J. Carson, Esq.
                          Berger & Montague, P.C.
                          1622 Locust Street
                          Philadelphia, PA 19103-6365

                          James A. Jones, Esq.
                          Richard J. Burch, Esq.
                          Bruckner Burch, PLLC
                          8 Greenway Plaza, Ste. 1500
                          Houston, TX  77046

For the Defendant:        Annette A. Idalski, Esq.
                          Peter N. Hall, Esq.
                          Chamberlain, Hrdlicka, White,
                            Williams & Aughtry
                          191 Peachtree Street, N.E.,
                          Atlanta, GA  30303

                          Keith E. Whitson, Esq.
                          Schnader, Harrison, Segal & Lewis
                          Fifth Avenue Place, Ste. 2700
                          120 Fifth Avenue
                          Pittsburgh, PA  15222-3001

Court Reporter:           Deborah Rowe, RMR, CRR
                          700 Grant Street, Ste. 5300
                          Pittsburgh, PA  15219
                          (412) 471-2510

P R O C E E D I N G S

- - -

(9:40 a.m.; in open court:)

THE COURT:  Good morning, everyone.  This is the time and place for hearing and oral argument in the matter styled Sloane versus Gulf Interstate Field Services, Incorporated.

Representing the Plaintiff here today we have Shanon Carson along with Richard "Rex" Burch and James Jones. And Plaintiff Thomas Sloane is also present.

Representing the Defendant today is Annette Idalski.  Along with her is Peter Hall.  Keith Whitson is here.  He's local counsel.  And Jerry Hoover is the general counsel of GIFS, the Defendant, and he is also present.

In addition, the Court would note that one of our summer interns is present here today.  My clerk, Mr. Catanese, met with all of you before we went on the record, and I understand that counsel have conferred and will hear argument relative to the motion that's pending.  And the way I normally hear argument, I hear argument, then I let the other side oppose, and I do permit reply and sur-reply.

I also permit people to give me supplemental briefing once they've heard each other's arguments and any questions that the Court and/or her clerk may have.

You'll have the option if you wish to get the

1    transcript of today's proceedings.  And to that end, if

2    anyone wants the transcript, then and in that event, there

3    will be a cost attached to same.

4         Now, as I prepared for today's proceedings and read

5    everything that's been put before the Court, I also reached

6    out to counsel on a couple of matters.  And to that end, as I

7    read the attachments and the affidavits, for example, there

8    were reference to exhibits that weren't filed on the record.

9         And to that end, in one instance we were able to

10   find those exhibits in the related Ohio litigation.  And in

11   another instance or two I entered Orders, and I know that

12   there were issues between counsel whether or not these things

13   should be produced or not, but I think that's resolved.  If

14   not, we'll hear discussion about that.

15        I am cognizant and I have read the Plaintiff's

16   response to Defendant's notice of filing documents.  And as I

17   said, we have looked at and researched everything that you

18   put before the Court.

19        And I think, as counsel are also aware, previously

20   in this matter the Court had the benefit of the complete

21   depositions of Mr. Sloane as well as Mr. Sprick, which the

22   Court had previously read.

23        Now, one thing that troubles this Court as I go

24   through all of this case, and before we get into this

25   argument whether this case should or shouldn't be

conditionally certified, you'll recall at the very outset I
questioned counsel about the background facts in this case
because, as is the case, pardon the pun, that we have had
numerous of these types of cases here in the Western
District. And most of those cases have come out of the
fracking environment, if you will.

And so at one of the early hearings in this case I
asked Miss Schalman-Bergen about the factual background why
this case is lodged here in the Western District. And
Miss Schalman-Bergen said, you know, I don't know offhand, in
response to my question about Gulf Interstate Field Services
operating in the Western District.

And then I asked, well, there are a lot of sites,
as I know, in Washington and Greene County, Mercer,
Greenville and the like.

And Ms. Schalman-Bergen was quick to tell me that
this matter was not a fracking matter, that this was related
to pipeline inspection. And she referenced the Kinder Morgan
project, and she said this was the pipeline that went through
PA, and based on her investigation and knowledge, there were
100 or 200 people who may have worked on that pipeline here
in Pennsylvania.

Then in preparation for today's proceedings, we got
a lot more detail, if you will, about this case from the
standpoint of the opt-in affidavits, Mr. Sloane's deposition

1    and the like.  And drilling down, this Kinder Morgan site is

2    in Wyalusing, Pennsylvania, which is Bradford County, which

3    is the Middle District of Pennsylvania.  And so I questioned,

4    you know, why this case is here.

5           And I noted that the Complaint had I would say a

6    cursory assertion about venue; and similarly, the Defendant

7    didn't raise venue.

8           But the civil cover sheet tells me Plaintiff is a

9    Texas resident.  He is based in Houston the last I know.  And

10   to that end, when the case was lodged here, there was nothing

11   indicated on this sheet, the form that we use, why Pittsburgh

12   division was selected over Johnstown and Erie.

13          But when I look at all of this material, Sloane

14   worked at the Kinder Morgan 319 project in Wyalusing,

15   Pennsylvania, Bradford County, from April 2014 to September

16   2014.  Then he went to Oklahoma from September 2014 to

17   October 2014, so says Mr. Sloane's resume, and so says the

18   supplemental declaration of Catherine Kramer.

19          And then I went through all of these affidavits or

20   declarations of these opt-ins, and Hinkle worked in West

21   Virginia for MarkWest.  Then he worked in Missouri on an

22   Enbridge Energy project.  Bish worked in West Virginia and

23   Ohio.  Stapleman worked in Arizona, New Mexico, Texas and

24   Arizona.  LaLonde, L-a-L-o-n-d-e, worked in New York, Ohio,

25   West Virginia and Virginia.  And Buggs Pollett's consent to

1  opt-in states he worked in Mississippi.

2  I see nothing in this record in front of me that

3  shows me that GIFS ever has had any kind of operations in the

4  Western District of Pennsylvania. In fact, based on

5  everything that I read here, all the HR payroll activities

6  and the like took place in Houston. And all of these

7  employees and former employees who have filed affidavits or

8  parts of depositions don't indicate any work in the Western

9  District from what I can tell.

10  So I question whether this case should continue

11  here and/or whether this case should be transferred either

12  under 1404 or 1406. And to that end, this Court has written

13  repeatedly on these issues of venue. And you may want to

14  take a look at those decisions.

15  The Court is also well aware that there is parallel

16  Ohio litigation. And to that end, I'm well aware of the

17  rulings that were made there.

18  And as pointed out in the latest briefing from the

19  Defendants, there's reliance on information from the Ohio

20  litigation. It's my understanding those Ohioans, if you want

21  to call them Ohioans, because many of these folks are

22  transient, you know, are not part of whatever we might be

23  doing here.

24  So the other thing that strikes me, and now that I

25  understand GIFS's business better, more or less they're a

staffing company, and they work for all of these various

entities.  I recall something like 47 different clients.

And so another question comes to mind, and one

reason why the Court wanted to look at the contracts between

GIFS and some of its clients was, you know, was there or

wasn't there an indemnity provision, or was there or wasn't

there an insurance coverage provision?

But it would seem to me that if this case is going

to go ahead, given some of the defense arguments in the case,

there would have to be a number of joinders.  So I also

wonder if this case is also faulty on that basis.

Because if you buy all of the arguments made by the

Defendant, it would appear that these people out in the

field, once they're in the field are more controlled, if you

will, by the clients of GIFS rather than GIFS itself relative

to their job duties.  So those are some of my initial

musings.

The other thing that I would say as a backdrop,

Ms. Idalski and her team repeatedly make an argument about

the unmanageability of this litigation, you know, if it would

happen to proceed here, because there's potentially 2,000

people involved.

Well, first, I don't know that all 2,000 will join

in.  Secondly, I've been in mass litigation repeatedly, and

to that end, as many as 30,000 claimants in a case.  And

1    those kinds of litigations can be handled with representative

2    Plaintiffs. They can be handled with cluster trials. They

3    can be handled with representative trials. So I don't think

4    we need to hear lots of argument on that.

5          But one thing I think we all should be looking at

6    in some detail is this issue of venue. And I don't think

7    it's enough that a pipeline might run across Erie. And if it

8    is running across Erie, then you don't belong in Pittsburgh.

9    You belong in Erie. So that's something else I think

10    everybody should be thinking about.

11          All right. So first we're going to hear from

12    Mr. Carson I think it is why I should conditionally certify

13    this, quote, nationwide class or not.

14          MR. BURCH: If it please the Court, Your Honor, I'm

15    going to speak on behalf of the Plaintiffs.

16          THE COURT: All right. You may proceed, sir.

17          MR. BURCH: Your Honor, the issue before you is not

18    one that you haven't seen before. This is a well-established

19    procedure for notifying people of their rights so that if

20    they wish to assert them and protect themselves against the

21    passage of the statute of limitations, they may do so. The

22    Supreme Court has said that that's the only function of what

23    we're doing right here, is giving these people judicial

24    notice so that they can stop the statute of limitations and

25    protect their claims if they choose to do so.

1        I want to pick up on something that Your Honor

2   said.  There is a lot of reference from the other side that

3   this is an almost 2,000-person class.  You know as well as I

4   do that the latest literature on this shows that the average

5   opt-in rate is 15.6 percent.  And so what we're really

6   talking about is potentially a few hundred people.

7        With respect to the standard for conditional

8   certification, Your Honor knows as well as anyone the

9   standard is not high.  It merely calls for some evidence

10  beyond mere speculation that there's a factual nexus between

11  the way that the employer's alleged policy affected the

12  Plaintiff and the other workers that are alleged to be

13  similarly situated to him.

14       And the focus here for conditional certification

15  purposes is not on whether an actual violation of the law has

16  occurred; but rather, whether the proposed Plaintiffs and the

17  other folks that are alleged to be similarly situated are

18  similar with respect to their allegation that the law has

19  been violated.

20       And that's absolutely the case here.  We have a

21  large group of workers who were given offer letters that

22  refer not to a salary, but to a day rate.  We have an

23  industry where this is a known problem.

24       There are multiple cases involving this exact

25  violation in this exact industry affecting workers just like

1    the ones that are present in this case.  Indeed, there's more

2    than one of these cases going on in this very courthouse.

3    And so this is a known problem in this industry.

4            And the defense to this case, as I appreciate it,

5    is not that they treated any of these people any differently.

6    It's not that they say they had a different pay system for

7    Mr. Sloane than they did for folks working across the bayou

8    in Ohio.  They don't say that.  What they say is we win.  We

9    treat them all the same, and we win.

10           And as Judge Posner has said on multiple occasions

11   in the Seventh Circuit opinion, when you're talking about an

12   issue of we're categorically right versus the Plaintiff

13   saying you're categorically wrong, that is a prime sort of

14   issue for class resolution.

15           And so in this case what we say is you gave them

16   letters that say they would be paid daily.  You then entered

17   that information into your own payroll system where it is

18   reflected as daily.  You then created pay stubs where, if you

19   divide the number of hours that are reflected on the pay stub

20   by ten, it invariably shows the number of days that they were

21   paid for multiplied by their daily rate.

22           That, Your Honor, is a common pay practice and a

23   common pay policy, and that is enough.

24           Now, there have been -- of course, you're familiar

25   with the Wood Group case, Mr. Carson's case.  That is the

same violation that is alleged to be present here.  We had
pipeline inspectors who are paid on a daily basis who were
given nationwide notice so that they could protect their
rights by filing an opt-in consent.

The same thing happened in the Ohio case against
Gulf Interstate.  Now, I won't bore Your Honor with the
background of that case, but at the time that motion for
conditional certification was filed, it was shortly after
Gulf Interstate fired their original counsel with whom we had
been to mediation on two occasions and we had met with on two
occasions -- excuse me -- more than two occasions.

They fired their lawyers, decided that they wanted
a different litigation strategy, but unfortunately at that
point, no discovery had been done, and the evidence that was
presented was limited to that particular project.

That's not the circumstance here.  What we have
here is we've done some preliminary discovery with respect to
conditional certification.  We now know that their position
is that they pay all of these people in the same manner
nationwide.

Again, we disagree as to whether or not their pay
system qualifies as a salary or not.  They're going to tell
you that it does.  All that's well and good.  We say it
doesn't.  We have evidence showing that it does not as a
salary basis.  And so that sort of thing can be handled on a

1    classwide basis unequivocally.

2            We will get an up or down vote on that based on

3    their story, based on our story.  So that sort of issue can

4    be resolved on a classwide basis.

5            Now, with respect to what we call the pipeline

6    inspectors, it is amazing to me that I hear from the other

7    side we don't know what you're talking about when you say

8    pipeline inspector.

9            If you Google pipeline inspector and Gulf

10   Interstate, you will get numerous results.  That's because

11   that's how these workers self-identify.  They identify

12   themselves as pipeline inspectors.  They have Facebook groups

13   for pipeline inspectors.  This is how people report to

14   themselves.  If you go on LinkedIn and look up pipeline

15   inspectors and Gulf Interstate, you will find people who

16   identify as pipeline inspectors.

17           And what they would like to do at the preliminary

18   stage is say, oh, no, this person is different from this

19   person because, rather than looking at a well to see whether

20   or not it's a dime high -- a nickel high and a dime wide,

21   which is the standard by which they evaluate wells that are

22   made on pipelines, they go and they run the jeep machine down

23   the coating of the pipe to see if there are any pockets where

24   it's too thin or too thick based on the exact specifications

25   that they've been provided.

1          Now, I want to -- so I think that what we have here
2     is a situation where we disagree not on whether or not these
3     people are treated the same, not on whether or not there is a
4     common pay policy, but whether or not that common policy
5     violates the law.  That is precisely the kind of case that
6     should be certified, because these people need the
7     opportunity to protect their rights.  And they need the
8     opportunity to stop the statute of limitations.
9          I want to address the issue of joinder just because
10    Your Honor had some questions about it.  Liability under the
11    Fair Labor Standards Act as well as under the Pennsylvania
12    Minimum Wage Act is joint and several.  And therefore, there
13    is no requirement of joinder.  It is true that there is a
14    good chance that Gulf Interstate's clients could be joint
15    employers of these workers.
16         THE COURT:  Yes.
17         MR. BURCH:  That doesn't make them a necessary
18    party.  Indeed, that's the purpose of joint and several
19    liability, is that it gives the workers the opportunity to
20    pick who it is they want to sue.
21         And in this case, keep in mind that the W-2
22    employer is Gulf Interstate.  The people running the payroll
23    are Gulf Interstate.  The people making the deals about how
24    these people are going to be paid -- and you've seen some of
25    the contracts.  The contracts with their clients call for the

1  payment of a daily rate.  The people that are in control of

2  the payroll process in this case are the folks at Gulf

3  Interstate.

4          And so given that in this case we have an employer

5  who has made the decision that it is going to implement a

6  nationwide pay plan with respect to a defined group of

7  workers, and there is an allegation that it is a day -- that

8  it is what it claims to be, that is, a day rate rather than a

9  salary, that is the kind of case that should be conditionally

10 certified, and notice should be given to these workers.

11          And I would just like to say, Your Honor, that with

12 respect to the venue issue, the pipeline does, in fact, pass

13 through the Western District of Pennsylvania --

14          THE COURT:  Where?

15          MR. BURCH:  I don't honestly know, Your Honor.

16 That's not something that I was prepared to talk about, but I

17 will get on the Internet while we're sitting here and see if

18 I could figure that out.

19          THE COURT:  Were workers here in the Western

20 District, or do we just have a pipeline?  Where were the

21 workers?

22          MR. BURCH:  The workers, as I understand it, were

23 in the Western District of Pennsylvania.

24          THE COURT:  Well, that's what you and

25 Miss Schalman-Bergen had said previously.

1          MR. BURCH:  True.

2          THE COURT:  And actually the compressor site where

3    Mr. Sloane worked is in Bradford County, and Bradford County

4    is Middle District.  So to that end, if the pipeline runs

5    through here, query, is that enough to give me venue when the

6    company, GIFS, is in Houston, and so is Mr. Sloane in Houston

7    and these employees, if any, pass through West Virginia --

8    excuse me -- pass through the Middle District of PA?

9          MR. BURCH:  It certainly is enough to give you

10   venue in the general sense.

11         THE COURT:  Well, I'll be interested in looking at

12   that.  We have the venue transfer factors and others under

13   1404 and 1406, this Court also has some discretion; and to

14   that end, it seems that all the records, for example, all the

15   payroll records, everything else, is in Houston.  A lot of

16   the key defense witnesses are in Houston.  Mr. Sloane as far

17   as I know is currently in Houston.

18         So I question, you know, why should this Court be

19   burdened with this litigation?  Should it be in Houston?

20   Should it be in Scranton?  I'm sure Scranton has seen a

21   number of these cases.

22         MR. BURCH:  They have, Your Honor, and we don't

23   have any bias against the Middle District of Pennsylvania.  I

24   mean it's not -- we looked at this issue on the front end;

25   and when we did our analysis, we said, okay, this is a

1  Western District of Pennsylvania.

2          So that's where we sued because that's where he

3  worked -- under our understanding, that's where he spent most

4  of his time working.  We may have made an error about that.

5  But venue with respect to a corporation is anywhere that they

6  do business.

7          THE COURT:  Correct, and that's why I also said in

8  my preface, based on everything I've read here, I don't see

9  GIFS doing much here in Western District.  Maybe you can show

10  me otherwise.

11          MR. BURCH:  Sure.  And of course, the parties can

12  also agree to venue.  And --

13          THE COURT:  They can.  That doesn't mean the Court

14  agrees.

15          MR. BURCH:  Of course, Your Honor.  I mean you

16  absolutely have the right to do what you think is best, and

17  we understand that.

18          We would say that delay in a case like this injures

19  the workers who are supposed to be protected by the

20  collective action process, because transferring this case and

21  delaying this case and delaying the issuance of notice will,

22  of course, result in the passage of time.

23          And under the statute, as Congress has laid it out,

24  until somebody files an opt-in consent, they will not be

25  protected from the passage of the -- the ticking of the

1  statute of limitations.

2          So in the event that Your Honor is inclined to take

3  up the venue issue, I would ask that we at least give the

4  people the opportunity to protect their right by giving them

5  notice, particularly since there have been no objections to

6  the Western District of Pennsylvania from the Defendant.

7          I think that that's all I have, Your Honor.  And I

8  believe that Ms. Idalski has a -- based on my firm's prior

9  experience with her, I believe she has a fairly extensive

10 PowerPoint presentation.  And so --

11         THE COURT:  So do we have copies for everybody?

12         MR. BURCH:  We don't, Your Honor.  We requested

13 that a few days ago, and the response was that --

14         THE COURT:  Okay.  It looks like we do now.

15         MS. IDALSKI:  Yes, Your Honor, we do.

16         THE COURT:  And it's always helpful for my court

17 reporter to have one, even though it can be displayed on the

18 screen here.

19         (Brief pause.)

20         THE COURT:  Okay.  Everybody has a copy now.  Good.

21         MS. IDALSKI:  You'll have it on your screen as we

22 go through it, so you don't really need a copy.  You'll have

23 it right in front of you on the computer.

24         THE COURT:  And counsel, Mr. Burch, has one; right?

25         MR. BURCH:  Just got it, yes.

1          THE COURT:  Do you want to take a minute to look

2   through it?

3          MR. BURCH:  No, Your Honor.  I can look through it

4   as we go through it and respond.  At this point it doesn't do

5   any good to get it as she's starting.

6          THE COURT:  Okay.

7          MS. IDALSKI:  And Your Honor, I'll say this is

8   essentially --

9          THE COURT:  Was it Mr. Sloane who asked for a copy?

10         MR. BURCH:  They did, and they said it's

11  attorney-client privilege, and they can't produce it.

12         THE COURT:  Oh, okay.

13         MS. IDALSKI:  Your Honor, we just finished it early

14  this morning.  We worked on it late last night.  Quite

15  frankly, we didn't start working on it until yesterday, so

16  there wouldn't have been -- and it's our argument.  So we

17  didn't get a copy of Plaintiff's argument outline, and they

18  have a copy now.

19         Your Honor, this is not a rubber stamp at this

20  point.  And what I just heard from Plaintiff was essentially

21  nothing, other than, gee, this is a known problem in the

22  industry.  There's a low standard.  We have lots of evidence,

23  but not -- no beef.  Where's the meat?

24         And isn't it curious that Plaintiffs have not

25  mentioned payroll records?  With all this evidence in the

1   record, payroll records are the evidence in these cases at

2   the merit stage and at the conditional certification stage,

3   because, Your Honor, you're right.

4          What typically happens is a Plaintiff will get a

5   pay stub, get their -- the counsel will get their client's

6   pay stub, and they'll see that there's some improper

7   deduction when the employer said that there's a salary, and

8   they'll attach it to the Complaint, just like they did in the

9   Fenley versus Wood Group Mustang case, the one they just told

10  you that was certified, and they'll say, hey, here's an

11  inference of a violation.  And those are the kinds of cases

12  that are conditionally certified.

13         Here they haven't given you anything other than an

14  allegation that there's a day rate.  They have less

15  inference -- we'll call it a factual inference at this point,

16  less evidence than they have in any other case.

17         If they would have showed us an improper deduction

18  or some type of inference of a pay issue, we would be

19  settling this case.  And that's what you typically see in

20  these cases.  This case is different.

21         And we wouldn't be going through all this if we

22  didn't feel so strongly about our case.  And the reason we

23  feel so strongly about our case and why we took the time

24  yesterday and all night last night and this morning to put

25  this PowerPoint together is because we're going to show you

1   the meat.  We're not going to just talk and make allegations

2   and blow a bunch of smoke about this is a known problem in

3   the industry.

4           I know the industry.  I represent oil field clients

5   all the time.  We settle these cases, and the ones where

6   we're paying correctly we don't settle.  This is a case where

7   we're paying correctly.

8           We're not asking you to make a merits

9   determination, but you can't ignore the evidence in the

10  record.  The Plaintiffs can't hide the payroll records from

11  you.  They can't hide all the pay letters from you and pick

12  and choose only the ones that they want.

13          So there's some hide the ball going on here, and

14  we're very concerned about this.  We do not want a notice

15  going out to 2,000 of our workers when we've been paying them

16  correctly.  These people are making $140,000 a year.  They're

17  making amazing salaries.  They're --

18          THE COURT:  They're making more money than a lot of

19  lawyers in the Western District.

20          MS. IDALSKI:  Exactly, Your Honor.  This is a

21  company that pays fairly, that's got payroll records that

22  show -- again, you're not making a merits determination, but

23  you've got to look at the evidence and say, okay, if I'm

24  going to stir up litigation and notify people of their

25  rights, let's call it that, then there's got to be something.

1    We have to show some inference other than saying this is a
2    day rate.  Okay?
3              So that's my problem with this case, is that they
4    haven't shown anything.  Mr. Burch got up here, and he said
5    to you, you know, it's a light standard.  And it is.  But
6    that doesn't mean it's a rubber stamp, because why did you
7    conduct discovery the last couple months?  Why didn't you
8    file your motion for conditional certification when you filed
9    your complaint months ago like in Fenley when they actually
10   attached evidence of a pay stub saying, hey, employer, you
11   screwed up?  And the Judge said sure.  We're going to
12   conditionally certify this.
13             So you do have to look at the facts of every case.
14   This is not a rubber stamp, and Mr. Burch said we have
15   evidence that this does not qualify as a salary basis.  What
16   is it?  I want to hear it today.  Okay?  And my client needs
17   to hear it today.  We've been waiting to hear it.  It's not
18   in the briefing.
19             So we've got a pay issue, and we've got a job
20   duties issue.  There's not a lick of evidence in the record
21   other than what the Court asked for, and even that's not
22   evidence because they don't tie it to Mr. Sloane.  Who knows
23   if Mr. Sloane performed the job duties on those job
24   descriptions?  The opt-in Plaintiffs in their declaration
25   don't say a thing about job descriptions.

1          THE COURT:  No.

2          MS. IDALSKI:  You don't have any evidence to

3    conditionally certify a nationwide collective action.  At

4    some point maybe they'll get evidence, and they can certify

5    in all these states and file individual lawsuits; but they

6    don't have it here, Your Honor.  They don't have it.  And you

7    know, I don't know what it's going to take to prove this

8    point to the Court.

9          I mean this is why we are not settling this case

10   for a seven-figure number.  They want us to walk into

11   mediation and settle this case for millions of dollars.  Why

12   should we do that?

13         We got payroll records right here that show that

14   these guys -- Mr. Sloane got paid every week the same amount.

15   No improper deductions.  Every one of these opt-in guys I

16   will show you got paid the same salary every week.  They're

17   making hundreds of thousands of dollars a year, and we want

18   to have a nationwide notice go out to all of our people?  I

19   mean that would be a miscarriage of justice.

20         And so, you know, as counsel for the Defendants,

21   I'm going to do everything I can here today to convince the

22   Court otherwise.  And that's all we can do.

23         So I know -- and I want to say, too, and when I say

24   hide the ball, and the Court has dealt with these kinds of

25   cases, but the Court is not an expert like me and Mr. Burch

1    and Mr. Carson and Mr. Hall and the other attorneys here --

2            THE COURT:  No.  I'm a generalist.

3            MS. IDALSKI:  Right.  We do this every day.  It's

4    easy to throw around terms like, Your Honor, it's a day rate.

5    You should certify a nationwide class, and the Court is to

6    look at all these cases and say, wow, it's so lenient, I have

7    to do this at this stage.  No, you don't, because you've got

8    to look at the evidence.

9            And you're right.  This case is unique.  There's

10   not an inference of a violation.  And I want to hear that

11   today.  I want to know what the factual nexus is, what is the

12   inference of a violation of a pay problem.  We can't just --

13   we can't make an allegation like we do in the Complaint that

14   it's a day rate.

15           First of all, we have to compare everybody to

16   Thomas Sloane.  We can't compare everybody to Mr. Hinkle.  So

17   in their briefing to you, Your Honor, they're saying, hey,

18   Your Honor, look.  Here is a pay letter from Mr. Hinkle, one

19   of the opt-ins, and it says day worked, and they're showing a

20   pay letter -- and does everybody have all the exhibits?

21   Okay.  We have exhibits for counsel and the Court and Mr.

22   Catanese.

23           So I'm not just going to say things up here.  I'm

24   going to prove every single thing I say so we can all set the

25   record straight on what the evidence is.

1    But we don't compare everybody -- we're not -- what

2  Plaintiffs have done is they've highlighted Mr. Hinkle in

3  their argument and said, look, Your Honor, here's his pay

4  letter, and then in a footnote say, by the way, here's

5  Mr. Sloane's pay letter, and here are the Ohio pay letters,

6  and here's a couple opt-in pay letters.

7    No.  We have to look at Mr. Sloane's pay letter,

8  and then we have to see are these other opt-ins and everyone

9  else, are they similarly situated to him?

10    And so what they're asking you to do is certainly

11  rubber stamp and send all this notice stirring up everybody

12  and all this litigation by E-mail and mail and reminder

13  notices that, hey, your legal rights may have been violated.

14    Well, you know, that's a big deal to a company

15  that's paying its employees hundreds of thousands of dollars.

16  And why should they have to settle for six, seven, eight

17  million dollars when they're doing everything right?  They

18  shouldn't, and they don't want to, and that's why we are

19  litigating and trying to show that we're right here.

20    All right.  So I have to bring up the Ohio

21  litigation.  Judge Sargus was -- and I mentioned, Your Honor,

22  we were going to talk to Judge Sargus, but I've read his

23  opinion letter about 25 times and looked at what evidence he

24  had in front of him at the time that he was making the same

25  decision you're being asked to make.

1          And he denied a collective action, and he had more

2     evidence than you have.  In the Ohio case they actually made

3     an inference -- we're not saying it's true, and we don't

4     agree with it and -- but they said in their declarations

5     we -- there was an unlawful deduction.  We didn't get paid

6     for sick time, and we didn't get paid for vacation.

7          If that's true, that would be a violation of the

8     salary basis test.  That would be enough to conditionally

9     certify a class because you showed an inference.  Here they

10    said, Your Honor, this is a day rate.

11         Okay.  What do you mean?  That's a legal

12    conclusion.  Based on what?

13         Well, based on Mr. Hinkle, the opt-in's pay letter,

14    because it says day worked; and we want to show you the same

15    letter that Judge Sargus saw in Ohio.  Even though

16    Mr. Sloane's pay letter said guaranteed salary, we don't want

17    to show you that, Judge.  They haven't said one word about

18    that in their motion.  They didn't even attach it as an

19    exhibit, which I think is hiding the ball.

20         We want to look at pay letters and show inference

21    of a violation?  Let's look at all the pay letters, good,

22    bad.  Let's look at them and see what we have.

23         So Judge Sargus said, okay, you know -- and you

24    have to stay on the slide -- Judge Sargus said I don't have

25    evidence of any unlawful violations, potentially unlawful

1    violations except for in Ohio.  So I'm just going to certify
2    this MarkWest Ohio project.
3            So the Plaintiffs here, what do they do?  They went
4    out and got five or six opt-ins who have worked in these
5    different states.  Great, but what's the violation?  What are
6    their job duties?  How do they relate to Mr. Sloane?
7            They haven't made that nexus.  You can't
8    conditionally certify.  It's not a rubber stamp, and I'm
9    going to go through the cases where they cite to Fenley and
10   Hively and all these other cases.  Judge, they do it here.
11   Well, in those cases they actually had pay stubs.  They had
12   some evidence of a potential violation, and you don't have it
13   here.
14           So Judge Sargus had better evidence, Judge, than
15   you have.
16           And I know you don't want me to talk about
17   manageability, but that was -- in the case law it does say
18   the Court should consider it.  If the Court thinks they can
19   manage a massive case like this, you know, that's for the
20   Court to decide.
21           But here's how this case is different.  This is not
22   Wal-Mart where we have one assistant manager, same policy all
23   over the United States.  We're going to have to go depose all
24   these different clients and all -- locate all the
25   supervisors, and what were these people doing, and they all

1    have different policies, different job descriptions.

2          I mean it's going to be a mess.  It's going to be a

3    huge undertaking.  I don't know even how you would instruct a

4    jury, all these different titles, all these different

5    exemptions.

6          THE COURT:  But you do recognize there are cases,

7    for example, where there's been a certified class, and then

8    subclasses are created, and cases can go to trial in flights.

9    That can happen.

10         MS. IDALSKI:  I understand, Your Honor, but here I

11   think discovery would be almost impossible, trying to locate

12   the policies of all the clients and all the different

13   supervisors.  I mean I don't even know how one would go about

14   it.  I've never seen a case like this that was conditionally

15   certified on a nationwide basis where you have so many

16   different job titles, so many different clients -- it's a

17   staffing company.  So that's what makes it different.

18         And you know what?  The manageability is really a

19   side issue because there's no evidence here.

20         And so let's talk about what the evidence is.  And

21   you can skip this slide.

22         So we said to you, Your Honor, in our briefing, you

23   know, look, you see -- it's very rare that an exemption case

24   is conditionally certified.  And the Plaintiff said no.  See,

25   I didn't fill out all my numbers on the slide, but Plaintiffs

1    came back and said here's a list of 46 cases, and they were

2    all conditionally certified, Your Honor, on a nationwide

3    basis.  Well, the vast majority, 35 of the 46, one job title.

4    In two of these, nationwide certification wasn't an issue,

5    and in several the Defendant didn't even object to the

6    nationwide certification.

7          And you know, they're not like this case, or

8    they're not a misclassification case because then you're

9    dealing with all these different exemptions.  You know, is

10   this person –– does the administrative exemption apply?  Does

11   the executive exemption apply?  It gets really confusing in

12   discovery, in trial, for the Court.

13         Courts like to keep things simple and manage their

14   dockets and say, look, we're throwing all these other job

15   titles out in ten or eleven cases, and we've got a list of

16   those in our chart as an exhibit where we're narrowing this

17   down to one job title.  We're going to make this manageable.

18   So it's not true that this is the norm that we conditionally

19   certify nationwide collective actions in exemption cases.

20         So Hively keeps coming up.  We know that's a case

21   the Court dealt with.

22         THE COURT:  I had 30 folks in that.

23         MS. IDALSKI:  Yes.  And of course, you'll

24   conditionally certify.  No harm no foul.  If you

25   conditionally certify, it's manageable.  You had one job

1  title.  You had one exemption.  So you can't compare that to
2  this.
3       And then in the -- I call it the Fenley case.
4  Plaintiff's counsel is calling it the Wood Group case.  It's
5  the Mustang case.  They say, look, Fenley was an exemption
6  case.
7       No.  Fenley wasn't an exemption case.  Fenley was a
8  real day rate case.  And in that case everyone -- and
9  Plaintiff's counsel can correct me if I'm wrong, and I've
10  read it several times and looked at the briefing.  The
11  Defendants actually admit that they were not exempt.  They
12  were classified as nonexempt, and they were not paying them
13  overtime.  They never classified them as exempt.
14       But what they did -- and Plaintiff's counsel
15  attached the Answer as an exhibit -- they raise it as a
16  defense.  They said, Your Honor, even though we classify them
17  as nonexempt, we can still raise the defense of exemptions.
18       Well, that's not an exemption case.  I mean they
19  threw that in as an affirmative defense.  And later they
20  wanted to argue it.  But that's nothing like what we have
21  here.  There was one job title in that case; okay?
22       Yes, it was certified on a nationwide basis in
23  Ohio.  Not anything like this case.  Much more -- different
24  in every way, shape or form.  It was a true day rate case.
25  It wasn't an exemption case.  One job title.  All they were

1   arguing about -- and the similarly situated -- so it was easy

2   to say they're similarly situated with regard to pay because

3   everybody agreed they weren't getting overtime.

4          We don't have that here.  What we have is payroll

5   records that no one wants to talk about.  We usually don't

6   have payroll records at this stage because, like I said in

7   our very first hearing, I've never seen discovery conducted

8   in a FLSA collective because there's this lenient standard,

9   and the Judge usually comes in and says, well, based on

10  something, the Complaint which has the pay stubs, or like

11  they did in this Fenley case, we're going to conditionally

12  certify it.

13         We have all this evidence.  We can't ignore it.

14  You know, it's not one of those cases where we just ignore it

15  and say as long as we allege a day rate and as long as we say

16  that there's DOL regulations about inspectors and job

17  descriptions, Judge, you should order the Defendants to send

18  out a notice to 2,000 people.  I mean that would be a

19  miscarriage of justice.  That can't be.  That's not the law.

20  And we have to look at these facts.

21         Okay.  And this -- Judge, I just want to bring this

22  to your attention.  This goes hand in hand with what I just

23  said.  And you can apply the lower standard if you want to at

24  your discretion.

25         But the lower standard in all the case law that

1   talks about leniency, again, is when you file your Complaint

2   and you attached as an exhibit what the unlawful policy is

3   purportedly to be and then you file your notice motion, and

4   we have no discovery, no nothing, and it's a light burden.

5           But if you come into the Court, and you say, Court,

6   we want discovery.  We can't make this showing if you don't

7   give us time to get payroll records and policies and

8   handbooks and all these things, and then you want to come

9   into Court and say, well, it's the lower standard, even

10  though all this discovery is in the record.

11          Well, no.  Courts have said now there's a modest

12  plus factual showing, not at the second stage because in

13  Hively I think you dealt with that and said, no, I'm not

14  going to stage two.  But you didn't have that issue in

15  Hively.

16          Here we've got payroll records.  We've got

17  depositions.  Mr. Sprick, he's not here, but we took his

18  deposition twice.  We took Cathie Kramer's deposition twice.

19  We got a lot of discovery.  We have the benefit of the

20  company's records in the Ohio case.

21          So I think the Court -- and I know the Court's very

22  detailed -- has to look at all the evidence.

23          We can skip through -- let's go back just to

24  confirm there's three sets of requests for production that

25  were sent in preparation for this motion --

1                    THE COURT:  And they were all responded to?

2                    MS. IDALSKI:  Yes, Your Honor.  And remember, we

3     got on the phone, and we talked about which ones -- we made

4     agreements as to what --

5                    THE COURT:  And it was reduced, but I just wanted

6     to confirm for the record that the requests sent were

7     actually responded to.

8                    MS. IDALSKI:  Yes, Your Honor.  All the payroll

9     records were produced.  Job descriptions were produced.  The

10    handbooks were produced.  You had asked for different

11    versions of job descriptions.  And there aren't any.

12                   THE COURT:  No.  I think I had asked for any

13    earlier versions of the employee handbook because what was

14    filed of record I think was 2015, and yet we're looking back

15    to '12, '13, '14.  And you've just indicated that there are

16    no further versions of that, but there might be a safety

17    handbook of '14.  And so that's what I was looking for.

18                   MS. IDALSKI:  Okay.

19                   THE COURT:  And then relative to the job

20    descriptions, there's reference to the job descriptions here,

21    but try as I might, I didn't see actual job descriptions.

22                   So to that end, you know, if they were produced, I

23    wanted to see what they had to say relative to these ten or

24    so job classifications and what they had to say.

25                   MS. IDALSKI:  And I'll address that right now, Your

1  Honor.  You're right.  The Plaintiffs mentioned --

2          THE COURT:  But before you go on, but you did

3  produce all the payroll records, and you did produce the job

4  descriptions, and you did --

5          MS. IDALSKI:  Yes.

6          THE COURT:  And you did produce the employee

7  handbook for 2015, and you've now asserted that there's no

8  earlier version of that?

9          MS. IDALSKI:  Correct, just a safety handbook.

10          THE COURT:  What else did you produce in discovery?

11          MS. IDALSKI:  We produced all the pay letters, all

12  the payroll of all the opt-ins, which together, that's this

13  case.  We produced the job descriptions.  If Mr. Hall might

14  help me out as to -- we produced everything we had that they

15  asked for.

16          I think we objected to earlier versions of handbook

17  because we said it was just safety.  So we didn't produce

18  that.  But now they have it because the Court asked for it.

19          We went through a deposition of Mr. Sprick, a

20  deposition of Mr. Kramer.  We answered two sets of

21  Interrogatories.

22          Of course, they had everything from the Hughes

23  case, which is a huge plus.  They had the deposition of

24  Mr. Sprick and Mr. Kramer there.  So there's a lot of

25  evidence --

1      THE COURT:  And Mr. Sloane was deposed.

2      MS. IDALSKI:  Mr. Sloane was deposed.  I mean if we

3  are to go through discovery, it's almost as if we've gone all

4  the way through discovery.  There's certainly a lot more here

5  than the typical Plaintiff who had the benefit of nothing

6  when he comes in and asks the Court for conditional

7  certification.

8      All right.  So just for your own information, Your

9  Honor, just this Creely case as, look, we can't grant the

10  parties time to do discovery and then not hold them to a

11  little bit higher of a standard.  It's not preponderance of

12  the evidence.  We're not making factual determinations.

13      But I'm going to -- we want to know what progress

14  have you made, Plaintiff?  Everybody took time, and as the

15  Plaintiff said, the statute is running, to conduct discovery,

16  and it's expensive.  How much progress have you made?  How

17  much progress Plaintiffs have made will be considered in

18  conjunction with Defendant's evidence.  So the Court has to

19  consider the Plaintiff's evidence and the Defendant's

20  evidence at this stage.

21      All right.  So as far as we can tell, based on what

22  we've seen, here is a summary of what the Plaintiff's

23  evidence is.  Okay?  As Mr. Burch told you, they said this is

24  a day rate case.  That's what they said in their Complaint.

25      You can't just say something is a day rate case

1   without, again, showing a potential unlawful deduct.  We

2   worked and we didn't get paid that day.  You don't have a

3   salary, GIFS.  You didn't pay us for sick time.  If you have

4   a bona fide sick leave policy, then you can deduct, but

5   there's got to be something.

6           Surely through all of these depositions, having the

7   benefit of payroll, having the benefit of Ohio, they can show

8   us why this is a day rate.  I'm baffled.  I just can't

9   believe that there's no evidence, and yet they want a

10  nationwide class certified.

11          So what they say is they say, well, the pay letter

12  uses the word day.  In the pay letter, which we're going to

13  see in a minute, it says $386, slash, day worked.

14          So based on that, that is evidence of a day rate.

15  We're going to ignore the payroll, and in one case we cited

16  the Court said, oh, no, you're not going to get away with

17  that.  Give me the payroll records.  If that's true and it's

18  a day rate, the pay stubs and payroll records will show that.

19  Let me see the payroll records.

20          But, Your Honor, they haven't mentioned the payroll

21  records at all.  That's a key to this decision right here and

22  the answer to whether or not they should be granted

23  conditional certification.

24          So what they did do is they took Mr. Hinkle, who's

25  an opt-in, and he has pay letters which say guaranteed rate.

He has pay letters which said we'll pay you every calendar
day.  That's certainly a guarantee if you get paid every day
of the week.  He has pay letters that say seven-day work
week.

So he's getting paid every day, and mind you,
they're making hundreds of thousands of dollars.  But guess
what?  They didn't show you a single one of those letters,
didn't even enter those into evidence.  Instead, what they
show the Court in their brief is one pay letter that he had
early on.  I think it was in 2013 or '12.

THE COURT:  Who is the "he" you just referenced?

MS. IDALSKI:  Pardon me?

THE COURT:  Who is the "he" you just referenced --

MS. IDALSKI:  Mr. Hinkle.

THE COURT:  -- for clarity of the record.

MS. IDALSKI:  Mr. Hinkle in 2012 had a pay letter
that said $386 a day, day worked, and the reason they wanted
to show you day worked is because they don't want you to say
that when he was guaranteed, when you say calendar day --
first of all, companies don't have to say in writing that
they're guaranteed a salary.  The payroll records show it.
So that's why when I evaluated this case, I said, oh, my
gosh, I mean there's so much evidence here.  Why are we being
sued?

It's unbelievable.  But Plaintiffs want to say,

1    well, you know what, those letters don't count because

2    Mr. Burch walked into GIFS, and he said, look, you're not

3    paying your people correctly.

4          So after that time the company said, oh, boy, our

5    letters are being misinterpreted.  We better put in the

6    records guaranteed, so we clarify how they pay.

7          So we did.  Nothing changed.  They didn't

8    reclassify or go from exempt to nonexempt like the Plaintiffs

9    are trying to argue to you, Your Honor.  If you look at the

10   payroll records, they're paid the same before and the same

11   after.  They just did what they thought was right to make it

12   clear for everybody that this is how they paid.  Now they're

13   being penalized for it.

14         THE COURT:  Now, these letters that initially went

15   out, did GIFS have counsel that helped draft these letters?

16         MS. IDALSKI:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MS. IDALSKI:  We did it at the advice of counsel

19   because, of course, that was the lynch pin to getting sued.

20   That's the only evidence we had right here.  We're still

21   going back to those old letters that say day rate.

22         Well, that's fine.  So what if it says day rate?

23   In fact, I'm going to show you a regulation that says you can

24   pay salary by the day, you can pay it by the hour.  Just

25   because this whole -- as Mr. Burch said, it's a known problem

1  in the industry.  It's a bad word to say day rate.  And

2  whenever anyone hears day rate, oh, gosh, we did something

3  wrong.  Pay us millions of dollars.

4         No.  No.  This is not a sweat shop where workers

5  are making $5 an hour, and they're not getting overtime, and

6  the company is taking advantage of them.  This is a company

7  that is paying their workers a lot of money.

8         If you really want to think about the public policy

9  and people's rights behind this whole thing, which I think is

10 important, too, a company who's done everything right is

11 having to go through this and is facing a nationwide notice.

12 And it's going to go out to all of its employees when they've

13 done everything right.

14        And that's why we put this PowerPoint together,

15 because all this briefing, it's a lot for the Court.  Okay.

16        So we have Mr. Hinkle's day rate pay letter.  The

17 pay letter uses the word day.  Plaintiff takes the word day

18 rate out of context from Cathie Kramer's deposition

19 transcript.  So you see the game they're playing.  Wherever

20 they say the term day or day rate, they tell the Court, well,

21 Cathie Kramer said there's a day rate.  No.  We're going to

22 look at Cathie Kramer's deposition transcript in a minute.

23        They tell the Judge in their list of bullet points,

24 Judge, they use the same department number, the same job code

25 and the same E-mail.  Who cares?  Everybody at GIFS has the

1    same job code and the same E-mail for time sheets; the

2    secretaries, Mr. Sprick.

3           So this is their evidence.  And then the

4    misrepresentation that because Mr. Burch told them they

5    weren't paying properly, they added the word guaranteed in

6    their pay letter, so this means we reclassified everybody.

7    No.  That's not what we did.

8           So the misrepresentation here, let's get into each

9    one.  I'll address each one and show you the evidence.  It's

10   not a day rate case.  It's an exemption case.  If it were a

11   day rate case, it would be like Fenley-Mustang Group where

12   we'd be in big trouble.  We'd be saying we classified these

13   people as nonexempt.  We don't pay them the same amount every

14   week, or we're making improper deductions.  So don't lie to

15   us, employer.  You're really paying a day rate.

16          And those are a lot of the cases that Mr. Burch and

17   Mr. Carson have had.  They wish they had that case here.

18   This is not that case.

19          So in our case, again, and I know the Court knows

20   this, but I just want to be clear on the record, we classify

21   our people at GIFS as -- you know, we use the executive

22   exemption for the chief inspectors who are supervising

23   people.  They're paid $455 per week on a salary basis the

24   records will show.

25          Again, I've not proven our case, but I'm just

1   showing you what's in the record.  The opt-in records will

2   show they make the same amount every week and that it's $455

3   a week, and whether or not they're exempt depends on job

4   duties.

5        We had the administrative exemption for the other

6   inspector, same thing.  Then all of these inspectors, pretty

7   much all of them will come under the highly compensated

8   exemption because they're making more than $100,000 a year.

9        So that's what kind of case we have, and I feel

10  like I'm now beating the issue to death on what the

11  difference is between a day rate case and an exemption case.

12  But we've cited the regulation.

13       So if you look at 29 C.F.R. 778.112, it explains

14  what a day rate case is.  You see a weekly salary

15  fluctuating.  We don't have that here.  You see a dispute

16  about how overtime should be calculated.  We don't have that

17  here.  You see these individuals only getting paid for the

18  days that they work.  You don't have that here.

19       What we have is a salary basis.  And I know we

20  disagree, and I'm not saying, again, make a merits

21  determination; but you can't ignore the evidence in the

22  record.  We got to see some factual nexus of a possible

23  violation that there's no salary basis.

24       And so I think I already explained to the Court

25  that a real day rate case is like the Fenley versus Wood

1    Group Mustang case, the one that was just conditionally

2    certified on a nationwide basis in Ohio.

3            And then the example of an exemption case like ours

4    is Castle versus Walling where you're seeing the company

5    classify everybody as exempt.  They're being paid a salary.

6    But in that case the payroll records showed an unlawful -- a

7    possible deduction that could be -- and we're not making a

8    merits determination -- unlawful, and that these employees

9    were not being paid a salary.  And so that's an exemption

10   case.  So that's the difference because I know the Court

11   keeps hearing about day rate cases.

12           What does the law say?  The law says the

13   regulations -- what is a salary basis?  We say we're exempt.

14   We say we pay on a salary basis.  Our payroll records show a

15   salary.  Do we really meet this -- what does it say?

16           "An employee will be considered to be paid on a

17   salary basis within the meaning of these regulations if the

18   employee regularly receives each pay period on a weekly, or

19   less frequent basis, a predetermined amount constituting all

20   or part of the employee's compensation, which amount is not

21   subject to reductions because of variations in the quality

22   and quantity of work."

23           So if you look at the payroll records, there's

24   nothing in there that shows they're not getting paid every

25   day they worked.

1    Now, Mr. Sloane testified -- well, we have time

2 sheets for Mr. Sloane that shows he turned in a time sheet

3 that shows he worked zero.  I worked zero days today.  He

4 still got paid.  When we deposed him, he said, oh, my

5 supervisor told me to do that, and I might have done some

6 paperwork that day.

7    So he won't admit that he didn't perform any work;

8 okay?  But still, when he turned in his time sheet, he put

9 zero hours, and he was paid.

10    So right now all the evidence, and we can't make a

11 merit determination, is pointing to the fact that he received

12 a salary.  So with Mr. Sloane we need to show an improper

13 deduction so that we have facts that could potentially lead

14 to an illegal pay practice.  We've got to determine that

15 before we send out notice to anybody.

16    And the other misnomer here is that salaries can't

17 be computed daily.  Remember, they keep telling you this is a

18 day rate case because they showed you Mr. Hinkle's opt-in pay

19 letter that shows day worked.

20    Well, salaries can be computed daily, 29 C.F.R.

21 541.604(b).  "An exempt employee's earnings may be computed

22 on a daily basis without losing the exemption or violating

23 the salary basis requirement, if the employment arrangement

24 also includes a guarantee of at least the minimum weekly

25 required amount paid on a salary basis regardless of the

number of hours, days or shifts worked, and" -- and here's
where a lot of these employers get it wrong, not GIFS, is
they'll pay a certain amount, maybe $455 a week every single
week no matter what, if the employee worked or not, but that
employee is usually taking home $2,000 a week.

And that would be a violation because the regs say,
no, you can't just guarantee a little bit.  What you
guarantee has to have a reasonable relationship to the actual
salary that the employee is making.

And so that's one area where a lot of these cases
are conditionally certified because this is a pretty high
standard to meet.  But guess what?  GIFS's payroll records
meet this requirement.

If you look at their pay letter and their payroll
records together, which you have in evidence, which the
Plaintiffs haven't talked about, it meets this test.

All right.  So our evidence, Defendant's evidence
are the pay letters which show the rate of pay per day, shows
a set amount of days per week that they're paid.  So that's
great.  It looks like we have a salary, and we claim we have
a salary.

What do the pay records show?  Do they show what
you say, GIFS?  Yes, they do, every single one, every opt-in
Plaintiff.  We've got them all in evidence, and we'll take a
look at them in a minute.

1          So the rate -- so the legal pay policy is the rate

2     of pay per day plus a certain number of days per week equals

3     a salary basis.

4          And then you look at the pay letter and the payroll

5     records, and you see -- you make that link that there is a

6     salary basis.  There's the same amount of compensation every

7     week.

8          So then you now turn to, okay, let's see.  Was

9     Mr. Sloane paid the same amount every week?  Yes.  He was

10    paid $2,702 except for in the first week and in the last week

11    because employers are allowed to deduct -- sometimes they

12    start in the middle of the week or end in the last week.

13         Same with Stapleman, $2,310 per week in 2013;

14    $3,100 per week in 2015.  Opt-in LaLonde, $2,700, 2013;

15    $2,500 in 2015.  Opt-in Casey Hinkle, $1,800 per week.

16         Again, Mr. Sloane is the person we have to look at

17    to compare everybody else to, and the red line shows his

18    actual pay, and if he were being paid a day rate, it would

19    fluctuate.  You would see all over the board some days he

20    would be paid, some days he wouldn't be paid.  We don't see

21    that.

22         So we have done a summary, and this is in the index

23    of documents that we've given Your Honor and counsel.  Tab 1

24    shows this same payroll summary, and it also shows the

25    payroll records, and it shows that in the first week, other

1 than the first and last week, and we cite the regulation

2 which says we can make deductions in those weeks legally and

3 still have a salary basis, he earned this exact same amount

4 of money, $5,404 I believe it was every two weeks.

5   Richard Stapleman, Tab 2 in your exhibits, same

6 thing. He got a guaranteed amount. It says in this pay

7 letter he's guaranteed seven days a week. He was paid seven

8 days a week.

9   And this says Casey Hinkle, Tab 5, same thing, same

10 amount. He was -- pay letter says salary, $362/day worked,

11 and he was paid the same amount.

12   So let's look at LaLonde. This is Tab 9, and here

13 he has some deductions. So he has absent eight days for

14 daughter's graduation. He's absent a week for daughter's

15 graduation. The regulations allow employers who pay a salary

16 to deduct for when no work is performed in a week or if it's

17 a day or more for personal reasons. And so those are proper

18 deductions, and we cite the regulations.

19   Okay. So we're hard pressed here to find -- to

20 figure out how this could possibly be a day rate. All right.

21 So the Court said in Hively citing Zavala, "similarly

22 situated can be established through some common employer

23 practice that, if proved, would help demonstrate a violation

24 of the FLSA."

25   So again, that's the standard. And other than

1   telling the Court that there's a day rate and the pay letter

2   says day, Cathie Kramer testified there was a day rate, taken

3   out of context, and we changed our policy after Rex Burch

4   came and talked to GIFS, we have no evidence not even to

5   satisfy the lenient standard after discovery, after payroll

6   records, nothing.

7           So again, let's address the pay letters now.  So

8   they've said to you in their motion and briefing it's a day

9   rate.  Let's look at the pay letters.  So they show you the

10  pay letters and attach them as exhibits.

11          So again, as I've stated over and over, number one,

12  they don't talk about payroll with the Court.  They don't

13  even enter it into evidence.

14          And again, I said this earlier, opt-in Hinkle is

15  used as the measuring stick in the brief.  And then we have

16  Sloane's pay letters and select opt-in pay letters in a

17  footnote.

18          So none of the pay letters that say guarantee or

19  every calendar day or seven days a week are shown to the

20  Court.

21          Again, this is about Thomas Sloane.  It's not about

22  Mr. Hinkle.  So Mr. Hinkle -- the Plaintiffs selected

23  evidence.  They show Hinkle's pay letters, and they show

24  three, and this is Tab 6 of the exhibits we gave the Court.

25  So they show the $362 a day worked, $419.95 and $267 a day

1    worked, and they're saying Your Honor, there can be a

2    reasonable inference based on this pay letter because it just

3    says day worked.  That sounds like a day rate.

4           I would agree with them, Your Honor, but that's all

5    they had, and they filed this motion, and they didn't have

6    those payroll records, and they didn't have any other

7    letters.

8           There could be an inference.  And that's what Judge

9    Sargus said.  Judge Sargus said, look, counsel in Ohio for

10   GIFS, I know -- I'm not making a merits determination, but I

11   do have a pay letter, and it says day worked.  So because

12   they're all the same, and they're all MarkWest Ohio, and

13   every single pay letter is the same, I'm going to certify

14   just this project.

15          Well, guess what?  Thomas Sloane's letter in this

16   case doesn't say day worked.  It says guaranteed, and it says

17   calendar day.  So we don't have what they had in Ohio.  We

18   have different pay letters for Mr. Sloane.  So here there's a

19   difference with regard to pay letters.

20          So how can you have a class?  If you want to

21   believe that day worked means day rate, it looks like

22   Mr. Sloane was actually guaranteed a salary, so he's the

23   wrong named Plaintiff.  They're not like Mr. Sloane.  I mean

24   that's one point.

25          So you don't really have a common pay policy.  But

1    keep in mind they didn't show you -- they should be saying,

2    Your Honor, here's Thomas Sloane's pay records -- or pay

3    letters, and here are other people who are just like him.

4    Right?  And here are their pay letters.

5            But that doesn't work out so well for them.  So

6    hoping maybe the Court's busy or no one's really going to

7    notice, and it's just a lenient standard, and as Mr. Rex

8    (sic) said, it's a known problem in the industry.  And we

9    make lots of money off these cases.  So maybe we'll get by,

10   and maybe we'll pull the wool over everybody's eyes, and

11   we'll get a nationwide class certified.

12           No.  Not with us.  And no, we're going to show the

13   truth.  Because the truth needs to come out here.  Enough's

14   enough.

15           Okay.  So here is Hinkle's pay letter, the one they

16   showed the Court, Plaintiff's selective evidence.  It's also

17   in Tab 10 of the exhibits we've provided everybody.  It says

18   $267/day worked.  They're right.  Maybe -- that could

19   possibly be -- you know, maybe that could be a day rate.

20           But let's look at the payroll records.  The payroll

21   records show he got paid 5 days guaranteed.

22           All right.  The next payroll letter, again, this is

23   2013, $362/day worked.  Payroll records show, again, that he

24   got paid for every day he worked.

25           Again, why do we care about Mr. Hinkle?  He's just

1  an opt-in.  But I'm just showing the Court what their

2  evidence is.  And this is what they briefed.

3          $419.95/day worked.  Look at his payroll records;

4  and other than the first week, he's paid the same.

5          Next?  So let's really look at Mr. Hinkle's pay

6  letters now.  It says in 2015, which was not presented to the

7  Court, it says guaranteed six days per week.  And you're darn

8  right.  After we were sued and there was a complaint that our

9  pay letters were not clear enough, we put in the word

10 guarantee, but nothing changed.  He was still paid for every

11 day pursuant to the payroll -- the payroll did not change.

12 Next?

13         2014, $355 a day, guaranteed five days a week.

14 $355 a day, five days per week.  You don't have the word

15 guarantee, but they're going to pay him five days per week no

16 matter what, and they did.  It was a fixed salary.  It even

17 says fixed salary.

18         You know what?  He is actually like Mr. Sloane in

19 that with respect to the last three years of his employment,

20 because he was guaranteed pay, just like Mr. Sloane.  But the

21 problem is it's not illegal.  It's legal.  You got to show

22 evidence of an illegal policy, not a legal one.

23         But Your Honor, you didn't see any of this in the

24 briefing, and if we didn't bring it to your attention and we

25 were busy and we didn't have time to go through the specifics

1    of the records, nobody would have known.  But this is the

2    evidence.

3            So now we're back to Mr. Sloane because we really

4    don't care about Mr. Hinkle.  He's not a Plaintiff in this

5    case.  We want people who are like Mr. Sloane.  Mr. Sloane in

6    a footnote says that Mr. Sloane was paid $386 per calendar

7    day, $386 guaranteed seven days per week.

8            If you'll remember, Your Honor, in the beginning he

9    was provided one letter which said calendar day.  He was

10   actually paid -- and think about that.  A calendar day, that

11   means every day.  Every day on the calendar he's paid.  So

12   essentially you don't even really need the word guarantee,

13   but the proof is in the pudding with the payroll records.

14           So who's like Mr. Sloane?  The only people like

15   Mr. Sloane were paid legally.  This is not about Mr. Hinkle

16   and day worked.  But even if it was, we could still show he

17   was paid the same salary.  So we've got Mr. Sloane's pay

18   letters, which are also Tab 7 of our exhibits.

19           Opt-in Stapleman, remember, the only evidence

20   provided to the Court by the Plaintiffs was day worked.  And

21   can you go back one more time?  We didn't -- Plaintiffs did

22   not enter into evidence the letters that said guaranteed

23   seven days a week based on a seven-day work week.

24           This guy's getting paid seven days whether he works

25   or not.  According to the payroll, that's a salary.  But we

1    don't want to show those letters, because they might be legal

2    practice.  And again, you know, it's a known problem in the

3    industry.

4           All right.  So here are copies in the next -- we

5    can go through these, Peter, showing -- just rolling up the

6    letters, and we have those for the Court.  We also put this

7    into evidence in our response briefs.

8           Then the same with LaLonde.  His letters weren't

9    entered into evidence either, and they all say guaranteed.  I

10   don't think he was even mentioned at all to the Court because

11   you know why?  All his pay letters say guaranteed.  And that

12   would mean a salary.

13          How can these people be similarly situated in pay?

14   Even if you believe their theory of day worked, you got some

15   people who are guaranteed a salary.

16          Again, where is the unlawful -- potentially

17   unlawful practice or facts that, if proved, would be unlawful

18   is the better way to say it?

19          So there's an Eastern District of Pennsylvania case

20   which says that if an employee is paid the same from week to

21   week, there can't be a day rate.  And we've cited this case

22   here.

23          So we need something more from the Plaintiffs if

24   they want this nationwide conditional certification, even if

25   they want the one project that Sloane was on to be

1  conditionally certified.

2          So the next thing we do in addition to just showing

3  the Court selective pay letters that say day worked, not

4  showing the Court any payroll, the next thing we show the

5  Court is, you know what, Your Honor, we deposed Cathie

6  Kramer, and she said that GIFS pays a day rate.

7          So they cite in their brief pipeline inspector on

8  every project other than the two paid hourly state

9  compensation -- I don't know.  Maybe I'm reading -- oh, they

10  say they're paid -- they just take out of context they're

11  paid a day rate.

12          But if you look at the whole transcript of Cathie

13  Kramer's depo, she explains that it's calculated on a daily

14  basis, which is allowed under the salary basis test in the

15  regulations.  She explains that in great detail.

16          "They enter the number of days into the system.

17          "They enter the number of days times ten into the

18  system; right?

19          "Yes.  The number of days that they are guaranteed

20  to be paid for.

21          "Times ten?

22          "Yes.

23          "Okay.  Ms. Kramer.  It would always be times ten

24  regardless of the number of hours a pipeline inspector might

25  put on their time sheet; correct?

1      "ANSWER:  They're paid a day rate.  So ten hours

2    equals the days, and then they're paid the number of days per

3    week that they're guaranteed."

4           So why would they just take out of context they're

5    paid a day rate?  Because right now it's all about semantics,

6    and it's all about lenient standards and all about stirring

7    up a bunch of litigation nationwide to force companies into

8    multi-million dollar settlements when they're actually doing

9    things right.

10          And it is rare.  It is rare to find companies doing

11    things right, Your Honor.  But when they are, they shouldn't

12    be penalized for it.

13          GIFS's management has consistently testified that

14    it pays a guaranteed salary and that the payroll records

15    support this fact.  So we invite the Court to read Cathie

16    Kramer's deposition testimony and Bob Sprick, and you'll see

17    that they testified that there was always a guarantee.  It

18    might not have said it in a pay letter, but they would say

19    calendar day, which to me means the same as a guarantee.

20          Again, we're playing word games, but the proof is

21    in the pudding, and the proof is in the payroll records,

22    which weren't brought up at all.

23          So this is not a rubber stamp.  There's plenty of

24    cases, including the Western District of Pennsylvania, which

25    say, look, you need significant evidence to conditionally

certify day rate cases.

And this Keenum case in Tennessee, the Plaintiff submitted pay stubs.  The Defendant admitted that they paid a day rate.  Thompson versus Peak Energy, they analyzed pay records, and all these cases they looked at the payroll records, or the Defendant stipulates that they paid a day rate.

Next:  So if the Court is concerned that the Court has to conditionally certify this because it's such a lenient standard, there are lots of Courts that won't do it if the evidence is not there.

Because again, the Supreme Court would have not required the Court to supervise notice and go through -- and have a standard even if it's a lenient standard if they were just going to want Courts to rubber stamp these things based on mere allegations.  There's got to be something else.

And Zavala versus Wal-Mart stores, this is a Third Circuit case, "Plaintiff must produce some evidence beyond pure speculation of a factual nexus."

Again, I'm asking what is -- what's the sum evidence on Plaintiff's side here?  "Unsupported assertions of widespread violations are not sufficient."  That's also in the Third Circuit, the District of New Jersey.

Conditional certification is denied when there's no evidence to support nationwide treatment.  These are Western

District of Pennsylvania cases where nationwide conditional
certification or conditional certification was outright
denied.

The Court cannot review Plaintiff's evidence in a
vacuum. It's got to review evidence submitted by the
Defendants. That's a Western District of Pennsylvania case,
Hall versus Guardsmark.

So the issue for the Plaintiffs now is be careful
what you ask for. You wanted discovery. Now you got all
this evidence in the record, and you got to deal with it.
And the Court has to consider it, and you've got to be able
to show some factual showing.

All that Judge Sargus had were some pay letters
that said day worked. He didn't have guarantee. He still
limited it to just that project. Here we don't even --
Thomas Sloane doesn't have a pay letter that says day worked.
It says guarantee. So how can you conditionally certify a
class when no one is similarly situated to the named
Plaintiff?

So again, I went back in trying to figure this
whole thing out. I mean our team has been -- we've been
baffled by this. What are we missing here? Maybe Mr. Burch
will tell us.

What did they do in Ohio? We need to look at
commonality. We want the Courts to do similar things. We

1   know in Ohio they didn't conditionally certify a nationwide

2   class, but they certified something.  They certified the

3   single project, and the reason why is they all had the same

4   pay letters, and they said day worked, and they were the

5   same.

6           And on top of that, Your Honor, they had the

7   allegation that they paid improper deductions because of sick

8   time and -- it was either vacation or holiday, one or the

9   other.

10          Here you've got all kinds of different pay letters,

11  and you've got to first look at Thomas Sloane.  Nobody's pay

12  letters match him.  You've got payroll records now that

13  you're looking at.  You're faced with no allegations of

14  improper deductions.  All you have is GIFS paid me a day

15  rate.

16          In Ohio, in those declarations, they all described

17  their job duties.  And GIFS said, well, that's not enough.

18  They're just basic job duties that they say they performed.

19  The Court said, well, it's something, and it's a lenient

20  standard.

21          We don't have anything here.  The Court had to even

22  go ask for the job descriptions.  And the reason why I

23  believe that they didn't put the job descriptions in

24  evidence, Your Honor, is they say it in their brief, and that

25  is they believe we created these job descriptions knowing --

and this is what they've summarized in their brief -- to make the position exempt.

So all the duties listed on the job descriptions, we tried to make sure they fit in with the exemption.  And so they don't want Mr. Sloane agreeing to those job descriptions because, if he does, it looks like he performed exempt job duties.

So on the one hand they want to say we have uniform job descriptions.  When Mr. Sprick testified that every client has their own job descriptions, they didn't ask for client job descriptions.  They asked for GIFS job descriptions.

So they can't have it both ways.  Somebody's got to link Mr. Sloane to the job descriptions.  You can't just say, well, Mr. Sloane didn't perform any of these job descriptions.  You did this after the Ohio litigation, and these are all exempt; but then on the other side of your mouth say, well, they had uniform job descriptions.

None of your opt-ins talk about what they did.  We don't know.  Some of them are welding inspectors or different type of inspectors, but they don't say they did the same things as Mr. Sloane.

In Ohio they all did the same thing they said. Again, you're not making a merits determination, but at least Judge Sargus had something.

1          And there's also a dispute going on by the

2     Plaintiffs that they don't have to talk about job duties.

3     When we got their initial motion, they only talked about pay,

4     and they just talked about DOL regs.  That's not true.

5          In exemption cases -- and that's why it's so

6     important for the Court to understand what an exemption case

7     is -- it's important for the Court to understand the

8     difference between an exemption case and a day rate case for

9     this reason.

10          In a day rate case -- and if you read the cases,

11    you'll see everybody admits they were nonexempt.  They're

12    arguing over overtime.  In an exemption case, they're paid a

13    salary or alleged to be paid a salary where they're

14    classified as administrative executive, highly compensated or

15    a combination.  And those cases say, look, because of those

16    exemptions, in order to meet the exemption, you have to be

17    paid a salary basis.

18          So pay is obviously similarly situated as to pay is

19    key, and in order to qualify for the exemption you have to

20    have certain job duties.  So that's why similarly situated as

21    to job duties is important.  So this is kind of complicated,

22    even for us, the difference between day rate and exemption,

23    and all this gets very confusing.

24          But I think the Plaintiffs are hoping it does

25    because then they can get their notice sent out, and who

1    knows, maybe Mr. Burch is right.  In my experience it's 30

2    percent opt-in rate in the cases I've been involved in.

3           But so what?  So you still have hundreds of people

4    who think they're owed money.  And they're being paid

5    hundreds of thousands of dollars a year, and the payroll

6    records show a salary.

7           So we think that would be -- we're nervous about

8    this, Your Honor, and we're concerned.  And we've been

9    working really hard to put this together to show you that

10   there is not enough evidence here for notice to go out

11   nationwide.  I don't even think there's enough evidence for

12   notice to go out to Mr. Sloane's project.

13          But you know, Courts feel like they got to certify

14   something because of this lenient standard.  I mean some

15   Courts have taken a hard line and said, no, we're not going

16   to certify anything.  Show me the evidence.

17          So there's several cases we cite in our PowerPoint

18   that say you're wrong.  Quote, Plaintiff's contention that

19   they don't have to show that they and the putative class have

20   similar job duties is not supported by the law.  When it's an

21   exemption case, you have to show similar job duties.

22          And in this case, Your Honor, I've gone on and on

23   about pay.  I think that that evidence is pretty strong.  But

24   also strong -- and we hit that pretty hard in our response --

25   is there's no evidence here of similarly situated job duties.

1    Mr. Sloane doesn't talk about his job duties.  The opt-ins

2    don't talk about their job duties.

3              Yes, we had job descriptions, but when did they

4    come out?  What dates did those job descriptions come out?

5    Who did they apply to?  Who received them?  Did Mr. Sloane

6    receive them?

7              The Plaintiff is saying Mr. Sloane's not going to

8    agree that he did those things because those are all exempt

9    job duties; and if they agreed to it, then they're admitting

10   that the job duties are exempt, and they don't want to give

11   up half of their case.  So they have a real problem.

12   Plaintiffs have a real problem here.

13             The other thing they say, Your Honor, is you know

14   what?  Common exempt status means similarly situated with

15   regard to pay.  If everybody is exempt, then therefore

16   everybody's the same.  And Courts have struck that down,

17   including the Western District of Pennsylvania.

18             Courts have readily exercised discretion and denied

19   conditional certification motions when Plaintiffs have relied

20   on a common exemption status as the factor that binds the

21   class together.  Simply alleging violations of the law by the

22   same employer is insufficient to justify a collective action.

23             We are bothered by the term pipeline inspector

24   because, again, that's another semantics, another word where

25   they even capitalize it.  These are welding inspectors.

1   There are different types of inspectors.  They do different

2   things.  Again, a merits decision.

3        We've shown this through some of the evidence that

4   we put in the record.  They all work for different companies.

5   There's no uniform anything.

6        So this whole idea of a pipeline inspector is just

7   a generic term.  And at least one Court has addressed --

8   didn't address pipeline inspector, but just generic

9   statements about job functions that create an overbroad

10  category is not permitted.

11       And Courts have also said it's not enough to rely

12  on job descriptions.  You can't just simply throw job

13  descriptions into the record and say everybody was treated

14  the same on a nationwide basis when you don't even have your

15  own named Plaintiff saying this is what he did.

16       So the Court has to consider all the evidence in

17  the record now.  Again, be careful what you ask for,

18  Plaintiffs, because now the Court has to look at everything.

19  And she can't just simply, because it's a known problem in

20  the industry with these day rates, and it's a lenient

21  standard, come in and say, well, all these people deserve

22  notice.

23       Yes, people deserve notice of their rights.  But

24  you can't stir up litigation against a company who appears to

25  be following the law on no evidence.  And so there's got to

1    be some justice here.  There's got to be something.  There is

2    a standard; and whether it's the lenient standard or whether

3    it's the plus standard, the modest factual plus, there's got

4    to be something.

5            What we have regarding job duties, we have no

6    evidence that Sloane's job duties are similar to the other

7    inspectors nationwide.  We have no evidence that his duties

8    are similar to the other opt-ins.  We have no evidence that

9    Sloane's job duties are those listed on the job descriptions.

10   We have no declaration from Mr. Sloane.

11           I mean that's -- typically -- I mean that's unheard

12   of.  No declaration with regard to what he did as far as his

13   job, and no attached evidence.

14           So I think Plaintiffs are just so used to getting

15   these things conditionally certified that they're getting a

16   little, you know, maybe lazy by not putting in -- maybe they

17   don't have the evidence, but it's not here.  It's not here

18   despite all of the leeway this Court has given the Plaintiffs

19   to conduct discovery.  Courts even asked for job descriptions

20   to be put in the record, and the Plaintiff didn't even put

21   them in themselves.

22           So what we have at the end of the day is we have

23   selective pay letters.  We don't have any payroll to show the

24   Court.  We have semantics.  We have, hey, Your Honor, this is

25   a day rate case.  It says -- you know, they pay by the day.

1   We have pipeline inspectors.  We have testimony taken out of

2   context out of Cathie Kramer's deposition.

3            We have 46 cases that don't support nationwide

4   collective actions like this one.  They're not exemption

5   cases.  They deal with one job title.  They're very different

6   than this case.  We have no evidence of job duties.

7            So we would ask the Court, and it is rare, and it

8   is unique, to not -- to deny this motion outright, and maybe

9   they'll have another bite of the apple when they file their

10  class certification motion in Pennsylvania, and maybe we'll

11  finally get some evidence.  But as far as a nationwide

12  collective action, we're not seeing any evidence.

13           Thank you, Your Honor.

14           THE COURT:  Okay.  Thank you, Miss Idalski.  It's

15  just about 11:15.  Our court reporter has been working very

16  hard.  So we're going to take a break for 15 minutes, and

17  we'll start again here at 11:30.

18           Close at hand there are two restrooms right through

19  the jury room, and the lights have been turned on if anybody

20  needs to use the necessary rooms.  Otherwise, you're way down

21  the halls on either end.  So we'll start here again, 11:30.

22           (A recess was taken at 11:14 a.m.)

23           (11:34 a.m.; in open court:)

24           THE COURT:  All right.  Now we're going to hear

25  from Mr. Burch in rebuttal; correct?

1    MR. BURCH:  Yes, Your Honor.

2    THE COURT:  Okay.

3    MR. BURCH:  Your Honor, everything that we heard

4  from the Defendant just now is not that these people are

5  somehow different or that they treated their pay any

6  differently, but that they're right, and that somehow this

7  case is different from the Wood Group case and from the other

8  day rate pipeline inspector cases that have been certified

9  because in those other cases they're admitting that there's

10  no exemption at play.

11    And I kind of wish the defense lawyers from the

12  Wood Group were here so that they could hear the things that

13  the Defendant in this case is saying because they are

14  literally identical to the things that the Wood Group said in

15  opposition to the motion for conditional certification in

16  that case.

17    They said that there is a total of ten different

18  job classifications with four levels at each job and up to 40

19  potential job titles that were paid incorrectly.

20    They say that they were paid a weekly salary

21  derived from a day rate multiplied by seven, which was shown

22  below satisfies a salary basis test.  This is the Wood Group

23  folks.

24    And so I'm hopeful that what we're actually seeing

25  is a reflection of an attempt to approve the Wood Group's

1  arguments and that they're not just ignoring them.

2          But I think more importantly we need to take a step

3  back because there does seem to be a common question of law

4  that is in dispute here.

5          The exemption defense, all of the exemption

6  defenses that they have raised have two elements.  The first

7  one is the salary basis test.  That's where they have to

8  prove that these people were paid on a salary basis rather

9  than, for example, on a day rate basis.

10         And then there is also a duties test where, again,

11  they have to prove that these folks were doing exempt work.

12  Those are both issues that they bear the burden of proof on.

13  And if they fail on either one, then they lose.  It is more

14  than enough for them not to have been salaried for them to

15  lose this case, for the inspectors not to have been salaried.

16         So let's talk about this a little bit.  They are

17  correct that we do look at the pay letters, and we do see

18  that they say you will be paid at first so many days -- so

19  much per day that you work.  That was then later changed

20  after I went and visited the folks at Gulf Interstate, and

21  they sent out a letter, a clarifying letter that says, oh, by

22  the way, you're guaranteed X number of days a week.

23         Now, there are problems with those letters, too,

24  but what's important to note is the Defendant doesn't say

25  that changed anything.  They say that that's still the same

1  pay practice that they always had.  So they allege that this

2  guarantee was supposedly always in existence.

3          If that's true, what would we expect to see during

4  the time that they're telling people, hey, you're going to be

5  paid on the basis of the days that you work?  We would expect

6  to see something instructing the folks in payroll, hey, by

7  the way, I know it says day rate, but don't actually pay a

8  day rate.  Pay this guarantee.

9          We think that there would be some method by which

10  the employees were informed, hey, by the way, we know we're

11  telling you you're going to be paid by the day.  But if

12  you're not -- if you aren't actually paid for, for example,

13  all seven days, then here's how you file a complaint and get

14  paid for all the days that you worked.

15          And what Miss Idalski has done, I don't fault her.

16  I mean it's what defense lawyers are supposed to do, is they

17  point to things that could be consistent with a salary basis

18  and say that establishes that we paid a salary.  But it

19  doesn't.  Because the things that they point to are as

20  consistent, if not more consistent, with a day rate.

21          For example, Miss Idalski got up here, and she told

22  you that even when Thomas Sloane put zero hours on his time

23  sheet, he was paid for those days worked.  That's actually

24  not the case.  When you get Mr. Sloane's time sheets -- I'm

25  sorry, Judge -- and you look at Mr. Sloane's time sheets, he

1   put hours on Sunday, Monday, Tuesday, Wednesday, Thursday,

2   Friday and Saturday.  Do you want to know why?  Because he

3   was working those days.  And it is wholly --

4           THE COURT:  You just displayed an exhibit.  Do you

5   want to make note of it for the record?

6           MR. BURCH:  Sure.  This is from our -- excuse me.

7   It's actually from their exhibit.  And it is part of their

8   exhibit -- excuse me -- it's part of our Exhibit 17, I

9   believe.

10          MR. CATANESE:  Mr. Burch, does that have a docket

11  number?

12          MR. BURCH:  It does not.  It does not have a Bates

13  stamp number that I can see.  And the docket number -- excuse

14  me -- the docket number is 99-5 or perhaps 15.  I apologize.

15  It's been stamped over.  So it's difficult for me to tell.

16  But it is part of the record that was submitted here.

17          MR. CATANESE:  Thank you.

18          MR. BURCH:  In addition, the folks at Gulf

19  Interstate say, hey, we can make full day deductions for

20  people who miss a day for sick or -- excuse me -- sickness or

21  disability, provided that there is a sickness or disability

22  plan that provides compensation.  That's right out of the

23  regs.

24          The problem is there is no sickness or disability

25  plan that provides compensation at Gulf Interstate, and we

1    know that because we can look at the pay statements.  And

2    again, we like these pay statements every bit as much as they

3    do or they profess to.

4            And if you look under paid time off, it says no

5    records found.  And we know why that is, because when we

6    talked to Mr. Sprick and we talked to the other folks at Gulf

7    Interstate, they say we don't even bother to keep track of

8    why people miss for a particular day.

9            THE COURT:  Okay.  And once again, can you cite

10   where that is in the record?  It was something in

11   Mr. Hinkle --

12           MR. BURCH:  It is Mr. Hinkle's, and the Bates

13   number is GIFS364, and this is going to be from our Exhibit

14   17 to the motion for conditional certification.

15           THE COURT:  Okay.  Go ahead.

16           MR. BURCH:  So the folks -- and Your Honor has read

17   the depositions -- the folks at Gulf Interstate want you to

18   believe that they have a guarantee and that that guarantee

19   provides people with payment on a guaranteed basis except for

20   those deductions that are permitted under the salary basis

21   test, of which there are several, but they are limited in

22   nature in the sense that there's only certain circumstances

23   under which they can apply.

24           And although there's absolutely nothing telling the

25   payroll department when they're supposed to pay and when

1    they're not supposed to pay or any of the payroll clerks how

2    they're supposed to react, if there are a certain number of

3    days -- excuse me -- what number of guaranteed days a person

4    supposedly has, even though there's no evidence of that

5    whatsoever, at least until the time that I came and talked to

6    them about how they were paying their people, they want you

7    to believe that there really was this guarantee.

8         All that's well and good.  Right?  And I guess I

9    should mention this.  They say that the absence of -- I

10   believe the quote they use is the absence of evidence is --

11        THE COURT:  Is no evidence.

12        MR. BURCH:  Is no evidence.  Thank you.  And that's

13   true.  But if I wanted to know if my money had been stolen,

14   and I went and looked to where the money was supposed to be,

15   and the money wasn't there, that would be some evidence that

16   my money had been taken.

17        And when you say we have this complicated pay plan

18   where we guarantee something that we don't tell anybody

19   about, that it's a secret guarantee, and we require our

20   payroll department to comply with our secret guarantee

21   payroll policy, and we only make the deductions under the few

22   limited circumstances that are permitted by law, there would

23   have to be something showing the existence of that paper.

24        And it's not enough for them to get up here and say

25   look at how these people got paid.  Because the way these

1  people got paid is every bit as consistent with them being in

2  the manner in which their pay letters reflect, which is on a

3  daily rate, which is, in fact, the way they pay these people.

4          Now, they can say we have a defense.  In fact, they

5  do say that.  They can say we're going to fight this case

6  until the end of time.  That is their right.  And if they

7  want to proceed in that manner, that's A-OK with me.

8          But what's not A-OK is for them to say, because we

9  say we didn't do it, people don't get to defend theirselves

10  or they don't get to stop the statute of limitations.  They

11  don't get to participate in this case.

12          If they think they've got a winner, great.  They

13  get a chance to prove they have a winner.  I think they have

14  a loser, and I get a chance to prove that.

15          And the workers that were affected by this policy,

16  which they have spent an hour trying to convince you is

17  absolutely the same for every single person, Mr. Hinkle,

18  Mr. Sloane, anybody else that they speak for, if they think

19  that common policy complies with the law, tee it up.

20          But what they don't get to say is let's not let

21  anybody stop the statute of limitations.  Let's not let

22  anybody else come forward and contest this.  Let's just do it

23  based on a few people and let the statute run out on

24  everybody else.

25          I feel like I should at least touch on the

1    discovery that was done, Your Honor, because they make it

2    sound as though class discovery has been completed.  And I'll

3    admit that when class discovery has been completed, there may

4    be a reason for employing a slightly heightened standard of

5    proof.  That's not what happened here.

6             We have some discovery with respect to the people

7    in this case.  We have some job descriptions which they

8    created after I went to visit them, and you can tell.  I mean

9    what job description do you know quotes the regulations when

10   describing the job descriptions?

11            I guarantee you that if they were called -- well,

12   excuse me.  Mr. Sprick was asked, and he said that counsel

13   did assist with creating the job description.  We don't have

14   the job descriptions that predate that.  They say they don't

15   exist.  I find that hard to believe.

16            But even those job descriptions show that the job

17   duties were common because they say these workers do the same

18   sort of thing.  And while Miss Idalski says, oh, well, each

19   client has their own job description for these positions,

20   well, where are they?  If that's true, why aren't they before

21   the Court?  Why are they hiding them?

22            And she says there's no evidence that the common

23   job descriptions actually described the job duties.  But

24   that's not what Mr. Sprick from Gulf Interstate testified to.

25            If you look at Document 110-3 at page 2, you can

1  see him say "we would have felt it was best that some of our

2  clients would like for us to have job descriptions that

3  actually reflect what our employees' responsibilities and

4  roles are." So according to them, they have descriptions

5  which accurately capture what their workers do.

6          And that matters a lot in this case because, again,

7  they bear the burden of proof on the duties test as well.

8  And the question is would they be prejudiced in trying to

9  present their defense if they have to proceed on a collective

10  basis? And the answer is no because they say they can prove

11  what these people do as a class. They say that they can do

12  what these proofs do.

13          But I want to come back to base, to the pay letter,

14  which by the way, it's unclear to me why Miss Idalski

15  believes that we didn't include pay letters other than the

16  ones that say you will be paid for a day's work, because we

17  did.

18          But even if we look at these other pay letters,

19  like Mr. Sloane, Mr. Sloane's first pay letter says you will

20  be paid X dollars per calendar day as approved by the client.

21  That's not a salary.

22          As Ms. Idalski showed you in part of her PowerPoint

23  presentation, a salary as a guarantee, particularly when

24  you're calculating on the basis of a day rate and as approved

25  by the client, is not guaranteeing them anything. It's

1    telling them if your pay is approved by the client, we will

2    pay it.  That is different.

3              I don't want to spend much more time, Your Honor,

4    on this issue.  If you have any questions, I'm happy to

5    answer it.

6              THE COURT:  I do have a question.

7              MR. BURCH:  Yes, Your Honor.

8              THE COURT:  Relative to your argument that there's

9    no direct this, that and no thing, what, if any, kind of

10   discovery did you do by way of request for production or

11   Interrogatories or questions to Mr. Sprick asking GIFS how it

12   was that they directed the people in the payroll department

13   to do what they did?  Was that asked?

14             MR. BURCH:  Yes, Your Honor.  And the answer --

15             THE COURT:  Okay.  Where was it asked?  Show me the

16   Interrogatory, the request for production, the questions to

17   Mr. Sprick.  How did that happen?

18             MR. BURCH:  It's one of our requests for

19   production, Your Honor.  I could find it for Your Honor, and

20   I'm happy to do it.

21             THE COURT:  I would like to see that, whether it's

22   by supplement or not.

23             MR. BURCH:  Sure.  And Your Honor, we do have a few

24   issues with respect to the notice itself that are still

25   outstanding.

1          THE COURT:  Right.  So why don't we finish the

2    argument first on whether or not this should or shouldn't be

3    conditionally certified?  Then we can talk about the notice.

4          And I had read everything, and I saw that you

5    disputed one or the other -- you know, what the notice should

6    or shouldn't say.  So I had suggested that counsel meet and

7    confer and see if they could come to an agreed upon notice.

8    But I guess that didn't happen.

9          MR. BURCH:  Your Honor, immediately after getting

10   your Order, we sent them an E-mail.  We said we have read

11   your response.  Here are the seven issues that you raise.  Of

12   those, there is already the language that you -- on three of

13   them there's already the language that you requested in

14   there:

15          Notify opt-ins that they could be required to

16   answer discovery, notify opt-ins they may be required to

17   appear at a deposition, notify opt-ins that they could be

18   called as a witness.  All that's already in there.

19          They asked us to strengthen the statement that the

20   Court has not made any determination of the merits.  We're

21   fine with that.  We added some proposed language.

22          And then the remaining issues were the 60 versus

23   90-day notice period, E-mail notice and the follow-up.  We

24   are more than happy to agree to a 60-day notice period,

25   provided that we can send E-mail and a follow-up notice.

1          It's not lost on Your Honor that these folks are

2     away from home for extended periods of time.  And so E-mail

3     notice is critical in a case like this, or a reminder notice

4     is appropriate for the same reason.

5          We -- I believe it was Mr. Hall -- apparently he

6     was not available to confer until some point late yesterday

7     and then this morning.  So we have conferred some.

8          THE COURT:  Well, there's always more time.  And I

9     don't anticipate you're going to be arguing all afternoon.

10    Everybody's here in Pittsburgh.  You're here in person.  My

11    jury room is wide open.  The cafeteria is open for business.

12    You can grab lunch, and you can sit down and talk.  So that

13    can happen.

14         But let's hear what the final or the remainder of

15    the argument is on whether this should or shouldn't be

16    conditionally certified, you know, whether it should be

17    whatever happened along the pipeline and at the compressor

18    project up in what is it called Wyalusing, PA, or whether it

19    should be national.

20         MS. IDALSKI:  Should I go, Your Honor?

21         THE COURT:  Yes.

22         MS. IDALSKI:  I'll address that point first, and

23    then I've got a few follow-ups from Mr. Burch's points.

24         Your Honor, I would say that at this point, because

25    due to the lack of evidence with respect to Mr. Sloane being

1  similarly situated to anyone else other than those people

2  that worked on the compressor station project, that at most

3  the Court could certify the project, just like Judge Sargus

4  did.

5  So it would be the Kinder Morgan project in

6  Pennsylvania.  Everyone would have the same pay letters.

7  Everyone would have the same supervisor.  It would be the

8  same company that they would be working for.

9  Again, I'm still not seeing an illegal pay

10  practice.  I didn't hear anything from Mr. Burch that

11  would -- he didn't talk about Mr. Sloane's payroll or pay

12  letters again.  He talked about -- we showed you Mr. Hinkle's

13  pay letter.

14  Let me address real quick while I'm on the topic he

15  showed you a time sheet of Mr. Sloane.  And I know -- I'm not

16  sure of Mr. Rex's (sic) involvement in the case; and Miss

17  Schalman-Bergen, I think you know she was at the deposition

18  and defended -- represented the Plaintiff at the deposition,

19  but Mr. Sloane testified that he had a computer, and he sent

20  his time sheets to his supervisor.

21  And they produced those time sheets to us, and he

22  showed that he had zero time worked.  And then when it was

23  sent to the supervisor at GIFS, because it's a guarantee, the

24  supervisor went ahead and put ten hours in.  And that was the

25  time sheet that Mr. Burch showed you.  I think that Mr. Burch

1  realized that fact.  But that is in the deposition transcript
2  of Mr. Sloane.  So again --
3          THE COURT:  You wouldn't happen to have page and
4  line?
5          MS. IDALSKI:  We can supplement that for you, Your
6  Honor.  And we'll also supplement the time sheet where he put
7  zero days -- zero time worked.
8          Then also you'll note on that day, at least on
9  Mr. Burch's -- when it was turned over -- that was actually
10  our evidence, our exhibit that we put in to show that we
11  changed it to ten hours when he said he worked zero; and then
12  when he didn't work, he would put zero mileage because every
13  day he worked he would have mileage, and you'll see that
14  there's zero mileage on that time sheet.
15          But remember, he's going to say he did some
16  paperwork every single day, that he worked every single day
17  he was employed with us.  But in any event, he was paid for
18  every single day that he ever worked for us.  He was
19  guaranteed that time, and he was paid that time.
20          I'm not seeing the argument on where is the
21  improper deduction argument or where is the potential illegal
22  pay policy?  They haven't shown that.
23          I don't know how the Court could certify a national
24  collective action with no evidence -- or even Pennsylvania.
25  If they have another chance -- like I said, to show -- to

1  Rule 23, to see if we can certify Rule 23, but right now
2  there's nothing.

3       Mr. Burch showed you Mr. Hinkle's pay stub and said
4  no.  It looks like they don't have a sickness or disability
5  policy.  I don't understand that.  It wouldn't be on a pay
6  stub; and furthermore, there's no allegation that there was
7  even a deduction for sick or disability or other on
8  Mr. Hinkle, and Mr. Hinkle's not who we're comparing people
9  to.  Mr. Hinkle is just an opt-in at this point.

10       And furthermore, it's not Defendant's burden right
11 now.  It's Plaintiff's burden to show an illegal pay
12 practice, and they haven't done that.

13       Mr. Burch said he wished that the Plaintiffs --
14 that the defense attorneys in the Fenley case could be here.
15 Well, I attached for the Court, because I anticipated this
16 argument with the Fenley case, because I'm sure -- they did
17 get nationwide certification in that case, and I could see
18 why they would want to use it to show it to the Court.  So I
19 got very familiar, intimately familiar with that case.

20       So Tab 12, we tabbed for the Court a notice motion
21 that Plaintiff's lawyers, Mr. Burch, Mr. Carson, whoever was
22 on that case filed.  And Mr. Burch just told you the
23 Defendants make the same exact argument as GIFS here.  They
24 also claimed exemption.  Let me read to you, and you've got
25 this, Your Honor --

1      THE COURT:  I do.

2      MS. IDALSKI:  Okay.  It's Tab 12, and it's page 2,

3 and Mr. Burch and Mr. Carson actually underlined and put in

4 bold, and I'll go ahead and read it now if I can find where

5 it starts -- WGM's corporate overtime and additional

6 compensation policy states that, quote, "nonexempt day rate

7 Mustangers receive a day rate that is inclusive of all hours

8 worked, including overtime," closed quote.

9      They actually had a policy, Your Honor, a day rate

10 policy in that case that was national.  We don't have that

11 here.  We don't have a policy.  We don't have a day rate

12 policy.

13      How can Mr. Burch say he wished the defense

14 attorneys were here because they have the same argument we

15 have?  This is not like our case.  Of course, when you have a

16 policy that's potentially illegal, you certify a nationwide

17 collective -- this is exactly the kind of case you should

18 certify.

19      Again, I don't know why they can't be honest and

20 call an ace an ace here.  I'm still looking for -- Mr. Hall

21 had just pointed out to me that in the briefing, the reply

22 brief Plaintiffs say when they listed their bullet points of

23 evidence on page 4, they said that one of our

24 misrepresentations in our brief was that Plaintiff must show

25 improper deductions to destroy the salary basis test.

1          This is an example.  It's one thing to show this

2    potential violation of the law.  In Mustang this nonexempt

3    day rate policy which -- you can't have a day rate policy

4    inclusive of all hours worked and overtime unless you, you

5    know, get an agreement with your employee, something called a

6    Belo contract.  We don't have all those things, and it's a

7    violation.

8          But this is a clear potential violation of the law,

9    potential.  And that's exactly the kind of evidence, and they

10   had this at the Complaint stage.  So they have a much better

11   case in Fenley.

12         But there can be no certification of a nationwide

13   collective.  There can't be a certification of a

14   Pennsylvania.  We still don't know -- the only people that

15   could potentially be similar to Mr. Sloane -- and again, we

16   don't even -- he hasn't even shown a violation yet -- could

17   be, just like Judge Sargus said, if you wanted to err on the

18   side of caution, the compressor project.  And again, the

19   compressor station, by the way, Your Honor, is not a

20   pipeline.  It's totally different.  So we don't even have

21   that in common.

22         So we have these people that worked on that project

23   or Kinder Morgan in Pennsylvania, and I think that's all the

24   Court could potentially certify here.  I just don't see the

25   evidence.

1     And so that's what I would suggest to the Court if
2  the Court's inclined to conditionally certify something.
3  Again, I don't think the Court should.  Mr. Burch is saying
4  that it's our burden to show -- we don't have any burden at
5  this stage.  We don't bear the burden -- the Defendants bear
6  the burden ultimately of job duties?  Not at this stage.
7  It's the Plaintiff's burden to show that there's a potential
8  violation of the law.

9     Now, they claim, which I'm not connecting the dots,
10  that we didn't tell our payroll department to pay a guarantee
11  because we don't have anything in writing.  But again, the
12  evidence shows that the guarantee was paid anyway.  And
13  again, we don't have the same evidence we had in Ohio.  We
14  don't have the same evidence we had in Fenley.

15     So we'll work out a notice I guess.  We didn't put
16  what the scope of the notice was, but we agree Mr. --
17  Mr. Hall and Your Honor, we were working trying to file a
18  sur-reply brief on Tuesday and trying to get ready for this
19  argument because it is a big deal to us.

20     Mr. Jones and Mr. Hall are the two people who know
21  most about what they talked about for the notice.  It looks
22  like we've agreed to pretty much everything except for how
23  the notice will be distributed, E-mail, U.S. mail, reminder.

24     I think everybody agrees to 60 days.  That's pretty
25  standard.  I would ask though that -- and I had this issue

1    before with counsel -- nothing go on the envelope.  No

2    special messages, important, please read, all in caps and

3    bold, none of that.

4            If there is a reminder, which we would object to

5    that -- I mean they're entitled to notice, not to be

6    harassed -- that we work on the language of that reminder.

7    So I think those are easy things to work out.

8            THE COURT:  Okay.  Well, thank you both for your

9    arguments here this morning.  Some housekeeping details:

10   Shall we make this PowerPoint a defense exhibit to the

11   transcript today?

12           MS. IDALSKI:  Thank you, Your Honor.

13           THE COURT:  So we'll just make that Defense

14   Exhibit 1 for purposes of the transcript.  Ms. Rowe has a

15   copy.

16           Secondly, do either or both of you want a copy of

17   the transcript?

18           MS. IDALSKI:  Yes, Your Honor.

19           THE COURT:  Mr. Burch?

20           MR.  BURCH:  I'm happy to split it with her, Your

21   Honor.

22           THE COURT:  So the Court will order preparation of

23   the transcript, and each side will pay their one-half share.

24           Now, based on everything we said, talked about,

25   et cetera, do either or both of you want to give me some

1  supplemental information?  I think that I have been promised

2  something from Mr. Burch and you, Ms. Idalski, relative to

3  citations in the record and relative to the request for

4  production, and I think it was what Mr. Sprick I think had to

5  say.

6            But outside of that, does anybody want to give me

7  anything else?  First, Mr. Burch?

8            MR. BURCH:  Your Honor, this is already a pretty

9  thick record.

10           THE COURT:  Right.

11           MR. BURCH:  I'm wondering if maybe we could just

12 say we'll both submit whatever we want to submit, no more

13 than five, ten pages, and whatever you requested by a week

14 from today if that makes sense.

15           THE COURT:  Okay.  And with the holiday you can do

16 that?

17           MR.  BURCH:  Yes.

18           THE COURT:  How about you, Ms. Idalski, and your

19 team?

20           MS. IDALSKI:  Your Honor --

21           THE COURT:  Today is the 26th.

22           MS. IDALSKI:  I don't believe we need to -- other

23 than the transcript and the document that shows zero time

24 worked, I don't believe that we need to --

25           THE COURT:  Whatever it is you give me, you'll get

1  it to me by June 2?  Is that good?

2            MS. IDALSKI:  Yes, Your Honor.

3            THE COURT:  Does anybody need this transcript

4  expedited?  If you do, there's an additional charge for that.

5            MR. BURCH:  I'm just being neighborly, Your Honor.

6  So --

7            THE COURT:  Okay.  Nobody needs expedition?

8            MS. IDALSKI:  No, Your Honor.

9            THE COURT:  Okay.  While we're all here, is there

10 anything else on the discovery front that people need to

11 debate, question and the like?  Or right now is everything

12 fairly copesetic?

13            MS. IDALSKI:  Your Honor, just one thing.  We may

14 need to depose Mr. Sloane again.  After his deposition we

15 received thousands of -- 8,000 documents from his computer

16 that were not previous -- that were previously produced, and

17 these were these time sheets that he would prepare and then

18 send on to GIFS along with E-mails.

19            So those would show potentially -- and we haven't

20 been through all them yet -- he claims that he did some work

21 on some days.  So we would like to depose him on these

22 records.  And I think we still have a couple hours left from

23 the original deposition.

24            THE COURT:  Okay.  That original deposition left

25 open --

1           MS. IDALSKI:  Yes.

2           THE COURT:  Pending -- okay.  Any problem with an

3    at additional hour or two for Mr. Sloane to go through the

4    documents he's now produced?

5           MR. BURCH:  I don't think so, Your Honor.

6           THE COURT:  Very good.  So that can happen.

7    Anything else then that we need to address here today?

8           And what I would suggest, like I said, since you're

9    all here, although some of you may need a nap since you were

10   up all night, I would suggest while you're here, use the jury

11   room, and you'd be welcome to bring a sandwich or salad,

12   et cetera, out there, and try to work out what you can on the

13   notice.  Then just give it to me as joint and show me where

14   you still disagree.  Then we'll make a ruling if we have to

15   make that ruling.

16          Anything else then for the Court's attention here

17   today?  Otherwise, we'll be in adjournment.

18          MR. BURCH:  Not from the Plaintiffs, Your Honor.

19          THE COURT:  Thank you, Mr. Burch.  Miss Idalski?

20          MS. IDALSKI:  Nothing, Your Honor.

21          THE COURT:  Thank you again.  And we actually added

22   another intern to the argument.  So the first intern must

23   have reported this is pretty good to watch.  Because there is

24   a criminal bank robbery charge going on in the courthouse,

25   too, so those are usually pretty exciting.

1          Have a good afternoon; and like I said, you're
2    welcome to stay here.  We do have two case management
3    conferences this afternoon.  We were also supposed to have a
4    change of plea, but that was continued because one of the
5    lawyers in the change of plea is still in trial.
6          So like I said, you're welcome to use that room if
7    you want to do it.  Okay?
8          MR. BURCH:  See you in a little while, Your Honor.
9          THE COURT:  Yes.  I'll be seeing you again.
10         (Proceedings were concluded at 12:10 p.m.)
11                              - - -
12
13
14
15
16
17                    C E R T I F I C A T E
18
19         I, Deborah Rowe, certify that the foregoing is
20   a correct transcript from the record of proceedings in the
21   above-titled matter.
22
23   S/Deborah Rowe  _____
24   Certified Realtime Reporter
25